1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

EASTERN DISTRICT OF CALIFORNIA

10

11  REIGNA ELISE FISHER,                    Case No.  1:13-cv-01261-SKO

12                                          **ORDER ON PLAINTIFF'S COMPLAINT**
                    Plaintiff,
13                                          (Doc. No. 16)

14          v.

15
    CAROLYN W. COLVIN,
16  Acting Commissioner of Social Security,

17                  Defendant.

18

19  _____

20

21                          **I.    INTRODUCTION**

22          Plaintiff, Reigna Elise Fisher ("Plaintiff"), seeks judicial review of a final decision of the

23  Commissioner of Social Security (the "Commissioner") denying her application for Disability

24  Insurance Benefits ("DIB") benefits pursuant to Titles II and XVI of the Social Security Act.

25  42 U.S.C. §§ 405(g), 1383(c).  The matter is currently before the Court on the parties' briefs,

26  which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States

27  Magistrate Judge.[1]

28  _____

    [1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 8, 10.)

## II.   FACTUAL BACKGROUND

Plaintiff was born on March 11, 1976, and alleges disability beginning on July 4, 2010. (AR 107; 131.)  Plaintiff claims she is disabled due to chronic migraines, adult Attention Deficit Disorder ("ADD"), and major depressive disorder.  (AR 17; 131.)

**A.   Relevant Medical Evidence**

**1.   Medical Records of Dr. Tamara L. Elkins, PhD**

On November 7, 2005, psychologist Dr. Tamara L. Elkins, PhD, wrote a letter to Dr. Arum Duggal, M.D., requesting that he extend Plaintiff's disability through December 30, 2005, to complete six additional therapy sessions "to work on changing [Plaintiff's] perceptions and responses around the stress of her job[.]"  (AR 327.)  On February 20, 2006, Dr. Elkins noted Plaintiff had "discontinued the Lexapro last December (2006) as she was managing emotions well and had resolved her panic episodes" but a "recent setback" had retriggered panic attacks. (AR 328.)  On August 9, 2006, Dr. Elkins again wrote Dr. Duggal, noting Plaintiff "had increased depression secondary to situation life stress" and recommending increasing her Prozac dosage. (AR 329.)

On May 14, 2010, Dr. Elkins wrote a letter "to whom it may concern" noting Plaintiff's "untreated Attention Deficit Disorder (ADHD-Inattentive Type)" caused her to become "easily distracted" and asking that her "occasional tardiness" be excused.  (AR 330.)  On August 14, 2010, Dr. Elkins wrote a letter to the "Social Security Department" noting she had been treating Plaintiff since November 7, 2005, for depression and anxiety "in relation to a stressful employment situation."  (AR 264; 332 (with "August" handwritten on the date).)   She had prescribed Plaintiff with antidepressant medications, Proxac and Lexapro, as well as Xanax for anxiety and Ambien to help with her sleep disturbances.  (AR 264.)  Dr. Elkins noted Plaintiff had also been diagnosed with ADD, which "complicated [her] ability to perform in job settings." (AR 264.)  Opining Plaintiff's anxiety and depression have both been treated, Dr. Elkins noted that "ADD has remained a problem for [Plaintiff], vocationally."  (AR 264.)

On July 22, 2010, Dr. Elkins completed a Doctor's Certification for Plaintiff's Claim for Disability Insurance Benefits, noting that Plaintiff's disability had begun on July 5, 2010, and

1    opining Plaintiff would return to work on September 15, 2010.  (AR 331.)  She diagnosed plaintiff

2    with Major Depressive Disorder, Anxiety Disorder, and Attention Deficit Disorder-Inattentive and

3    noted that Plaintiff was receiving Prozac, Adderall, and psychotherapy.  (AR 331.)

4        **2.    Consultative Psychological Evaluation by Dr. Deborah von Bolschwing, PhD**

5        On June 9, 2010, Dr. Deborah von Bolschwing, PhD, conducted a psychological disability

6    evaluation, including the Weschsler Adult Intelligence Scale-IV (WAIS-IV), Trail-Making Test,

7    Parts A & B, and Bender-Gestalt Test-II.  (AR 268-71.)  Plaintiff drove to the evaluation, arrived

8    on time, and was a "fair historian[,]" though she had "problems remembering time frames and

9    events, resulting in difficulty obtaining accurate dates or a detailed personal history."  (AR 268.)

10   Dr. von Bolschwing noted Plaintiff had been diagnosed with depression and anxiety in 2005 and

11   claimed to be "stressed out" because of her ADD, having difficulty being on time and

12   multitasking.  (AR 268.)

13       Plaintiff also reported being diagnosed with Attention-Deficit/Hyperactivity Disorder

14   (ADHD), accounting for her symptoms including poor concentration, inattention, and

15   distractibility.  (AR 268.)  She reported "she has difficulty holding a job due to her inability to

16   focus, poor attendance, and tardiness."  (AR 269.)  Plaintiff also reported a history of chronic

17   migraines, acne, and right shoulder strain, and noted that she took Fluoxetine and Methylphenidate

18   for her psychiatric symptoms.  (AR 269.)  Plaintiff reported being able to independently take a

19   bus, drive a car, go grocery shopping unattended for a few items at a time, dress and groom

20   herself, and do simple household chores such as washing dishes, doing small loads of laundry, and

21   preparing simple meals.  (AR 269.)

22       Dr. von Bolschwing observed Plaintiff had a normal gait, appropriate clothing, and

23   adequate hygiene, and was alert and oriented with clear and coherent speech, linear thought

24   process, and logical thought content.  (AR 269.)  Plaintiff's affect was mildly restricted and her

25   mood was mildly depressed, though during the testing process Plaintiff was cooperative and

26   appeared invested in her performance.  (AR 269.)  In the WAIS-IV test, Plaintiff's Verbal

27   Comprehension Index, Perceptual Reasoning Index, and Working Memory Index scores fell in the

28   average range, and her Processing Speed Index score fell within the low average range – a

difference that "appeared to be due to inattention." (AR 270.) Her Full Scale IQ score fell within the average range, and clinical observation and her overall performance "suggest[ed] current visuomotor intellectual functioning within the average range." (AR 269.) Plaintiff's scores on Parts A and B of the Trail-Making test were within the average range, and her "pattern of performance on this test suggest[ed] adequate sequencing ability, visual scanning speed, psychomotor speed, and the ability to make congnitive shifts." (AR 269.)

Finally, Plaintiff's score on the Bender-Gestalt Test-II was in the high-average range, suggesting above-average visuoconstruction ability. (AR 269.) Dr. von Bolschwing opined that while the evaluation was limited in scope and based on only one session of client contact in a structured environment, Plaintiff's "psychiatric symptoms appeared to be mostly controlled by medication[,]" her overall intellectual ability fell within the average range, and

> [Plaintiff] appears able to understand, remember, and carry out simple, detailed, and complex instructions without difficulty. She was able to maintain attention, concentration, and pace for the duration of the evaluation. She demonstrated adequate persistence. She had mild difficulty enduring the stress of the interview. She appears able to adapt to changes in routine work settings. She was able to interact with this examiner. Based upon observations of current behavior and reported psychiatric history, her ability to interact with the public, supervisors, and coworkers appears to be adequate with continued use of her psychotropic medication. An additional obstacle to adequate work performance may be the claimant's medical condition. This matter is beyond the scope of today's evaluation, and is deferred to medical opinion.

(AR 271.)

### 3. Consultative Neurological Evaluation by Dr. Fariba Vesali, M.D.

On July 23, 2010, Dr. Fariba Vesali, M.D., performed a comprehensive neurological evaluation of Plaintiff. (AR 274-77.) Dr. Vesali noted Plaintiff had suffered from migraine headaches since sustaining a "greenstick fracture of the skull" during a car accident when she was six years old. (AR 274.) She reported the "frequency of the headaches is significantly worse recently" and "she has one or two episodes of migraine headaches per week." (AR 274.) Plaintiff described her migraine headaches as being "located on the right side of her head starting in the frontal area and radiating to the back," and reported that when she has the headaches, she feels nauseated, sometimes sees blurry spots, has sensitivity to sound, light, and smell, and "the

opposite side of her face and sometimes her hands will become numb." (AR 274.) Plaintiff also complained of tension headaches occurring once or twice a week and lasting for two to five days, "starting in the upper back and neck and radiating to the head and wrapping around the head." (AR 274.)

On examination, Plaintiff appeared "awake, alert and oriented to time, place and person" with normal speech. (AR 275.) She had no difficulty getting on or off the examination table, or with following a "three-step command." (AR 275.) Dr. Vesali noted Plaintiff's Spurling, Speed, Phalen, and Patrick tests were negative bilaterally, her axial compression test was negative, there was no tenderness of the cervical, thoracic, or lumbosacral spine or temporomandibular joint, no myofascial tender points at the bilateral upper trapezius, and no tenderness of inflammation of the bilateral upper and lower extremities. (AR 276.) Dr. Vesali diagnosed Plaintiff with "headache" and opined that he "did not feel that her condition will impose limitations for 12 continuous months." (AR 277.)

**4.      Psychiatric Review Technique by Dr. Philip Walls, M.D.**

Dr. Philip Walls, M.D., completed a Psychiatric Review Technique ("PRTF") form on September 10, 2010, noting that Plaintiff had non-severe impairments, singly and in combination, of ADD, Depressive Disorder, and Anxiety Disorder. (AR 278-91; *see* AR 290.) He found Plaintiff had mild restrictions of activities of daily living, difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and had no episodes of decompensation of extended duration. (AR 288.) Dr. Walls further opined that the medical evidence did not establish the presence of "C" criteria under Listings 12.02, 12.03, 12.04, or 12.06. (AR 289.)

**5.      Case Analyses by Non-Examining Agency Physicians**

On May 24, 2010, agency consultative physician Dr. E. Wong, M.D., found that Plaintiff's ADLs did not indicate a severe physical impairment, and while the medical record indicated "some motivational issues," her "ADLs are not compromised as she drives, maintains home and manages her funds." (AR 265-67.) Dr. Wong found "no severe work limitations" based on Plaintiff's alleged mental impairments. (AR 267.)

On January 11, 2011, agency consultative physician Dr. L. Guyer, M.D., found that while Plaintiff's impairments were non-severe, her ADLs were "significantly limited both mentally and physically."  (AR 307.)  However, Dr. Guyer affirmed the prior finding of "non-severe" because he found the allegations "[n]ot credible due to a lack of objective medical findings to support allegations and/or limitations[.]"  (AR 308.)

On January 21, 2011, Dr. Alan Goldberg, Psy.D., ABPP, J.D., reviewed the medical evidence and determined that Plaintiff's "mental impairment is non-severe.  There is no objective evidence in [the] file to alter [Dr. Wall's PRTF], which indicated non-severe mental impairment."  (AR 311.)

### 6.      Medical Records from Dr. Arun Duggal, M.D.

Dr. Arun Duggal, M.D., saw Plaintiff for ADD, depression, cervical myositis, migraine headaches, bilateral shoulder pain, and neck stiffness from March 2007 through April 2010. (AR 248-62.)  As early as March 2007, Plaintiff was complaining about lateralized "temporal throbbing" headaches, and reported seeing a psychologist for her depression and neuroses. (AR 261-62.)  Notably, on April 8, 2009, Plaintiff complained of a headache lasting five days (AR 253) and on December 1, 2009, Plaintiff reported a throbbing headache lasting four days, accompanied by mild nausea and photophobia (AR 250).  On March 4, 2010, Dr. Duggal noted Plaintiff had seen a psychologist and complained of increased stress, memory problems, feelings of being overwhelmed, and trouble focusing.  (AR 249.)

On June 22, 2011, Dr. Duggal completed a Physical Residual Functional Capacity (RFC) Questionnaire, opining that he had known Plaintiff for six years and had diagnosed her with ADD, cervical myositis with migraine headaches, depression, and left shoulder pain with impingement. (AR 323-26.)  He denied Plaintiff was a malingerer, and opined Plaintiff's depression and anxiety affected her physical condition.  (AR 324.)  Dr. Duggal further opined that while Plaintiff's experience of pain or other symptoms were severe enough to frequently interfere with her attention and concentration in performing even simple work tasks, she was capable of tolerating low stress jobs.  (AR 324.)

//

Dr. Duggal noted Plaintiff could walk a block and a half without rest or severe pain, could sit and stand no more than thirty minutes at one time before needing to get up, and could sit and stand for about two hours in an 8-hour workday.  (AR 324-25.)  Dr. Duggal opined Plaintiff would need a job allowing her to take unscheduled breaks and shift positions at will, to never lift 50 pounds or more and only occasionally lift less, and rarely look down or up, turn her head side to side or hold it in a static position, twist, stoop, crouch, or climb ladders or stairs.  (AR 325-26.) Dr. Duggal further opined Plaintiff had significant limitations with reaching, handling, or fingering, and limited the percentage of time she could engage in fine or gross manipulation or reaching to only 10% of an 8-hour workday.  (AR 326.)  Finally, Dr. Duggal noted Plaintiff would have "good days" and "bad days" and would be absent more than four days per month due to her impairments.  (AR 326.)

### 7.  Medical Records from Dr. Frank Fine, M.D.

Dr. Frank Fine, M.D., noted on November 7, 2008, that Plaintiff had a "history of migraine headaches diagnosed since she was age 6" that had worsened over the past five years.  (AR 245-46; 305-06; 320-22.)  She described her headaches as "throbbing and pounding," lasting up to three days, and radiating from the base of her skull through the bi-temporal areas.  (AR 245.)  He noted that the headaches are accompanied by photosensitivity to light and nausea, but no blurring of vision.  (AR 245.)  She had "tried several triptans" medications, none of which had proven "very effective" to prevent and treat her pain, and "will go to the emergency room and get a Demerol injection" when the pain was too severe.  (AR 245-46.)

Dr. Fine notes Plaintiff had had a neurology evaluation with "Dr. Porecha," who had obtained an MRI of her brain, an eye exam, and some allergy testing, all of which Plaintiff reported as having shown normal results.  (AR 245.)  Plaintiff also reported Dr. Porecha had "told her [the headaches were due to] tension and she just needs to relax, but she states this is not helping."  (AR 245.)  Dr. Fine opined Plaintiff suffered from migraine headaches, and gave her prescriptions for Topamax "for headache prophylaxis," Norco for pain, and Phenergan for the nausea associated with headaches.

//

On July 19, 2011, Dr. Fine completed a Physical Residual Functional Capacity (RFC) Questionnaire, opining that he had known Plaintiff for five years and had diagnosed her with migraine headaches, depression, anxiety, and restless leg syndrome.  (AR 333-36.)  He denied Plaintiff was a malingerer, and thought her depression and anxiety affected her physical condition.  (AR 324.)  Dr. Fine opined that while Plaintiff's experience of pain or other symptoms were severe enough to frequently interfere with her attention and concentration in performing even simple work tasks, she was capable of tolerating low stress jobs.  (AR 334.)

Dr. Duggal noted Plaintiff could walk a block without rest or severe pain, could sit and stand no more than two and a half hours at one time before needing to get up, and could sit and stand for at least six hours in an 8-hour workday.  (AR 334-35.)  Dr. Fine opined Plaintiff would need a job allowing her to take unscheduled breaks but would not need to shift positions at will, and that she could occasionally lift and carry ten pounds or less and rarely lift and carry twenty to fifty pounds.  (AR 335.)  He opined she could occasionally look down or up, turn her head side to side or hold it in a static position, twist, stoop, crouch, or climb ladders or stairs.  (AR 335-36.)  Dr. Fine further opined Plaintiff had no limitations with reaching, handling, or fingering.  (AR 336.)  Finally, Dr. Duggal noted Plaintiff would have both "good days" and "bad days," and would be absent more than four days per month due to her impairments.  (AR 336.)

**8.      Medical Records from Rebecca Fry, Marriage and Family Therapist Trainee**

Plaintiff saw Rebecca Fry, Marriage and Family Therapist Trainee, from January 11, 2011, through May 10, 2011.  (AR 338-61.)  During the initial evaluation on January 11, 2011, Plaintiff reported a history of migraines starting when she was six years old and suffered a greenstick fracture to the skull.  (AR 358.)  Plaintiff had suffered from depression "for about a year, and symptoms have worsened since August [2009.]"  (AR 355.)  She also reported being diagnosed with fibromyalgia and suffering from migraines three times a week.  (AR 356.)  Plaintiff claimed that "because she ra[re]ly leaves the house, she has no motivation to shower and often goes several days without a shower."  (AR 351; 353; 355.)

The progress notes reflect that Plaintiff rescheduled appointments with Ms. Fry several times, including a request to cancel due to illness on February 1st (AR 348; 350 (migraine lasting

several days)), March 1st (AR 345 (migraine)), March 8th (AR 344 (illness), March 16th (AR 342 (pneumonia)), April 5th (AR 340 (pneumonia)).  Plaintiff also failed to appear for appointments on March 15 and May 10, 2011, with no explanation.  (AR 338, 343.)  Ms. Fry worked with Plaintiff on "treatment goals of improving self-esteem, decreasing negative self-talk, and learning coping skills." (*See, e.g.*, AR 348-49.)

**B.     Witness Testimony and Submissions**

**1.     Plaintiff's Headache Questionnaire**

Plaintiff completed a Headache Questionnaire on April 27, 2010, stating that she has suffered from migraine and tension headaches since she was six years old.  (AR 140-41.)  She has an average of three migraine headaches per month, each averaging 72 hours in duration, and an average of three tension headaches per week, each averaging 48 hours in duration.  (AR 140.) Plaintiff characterizes her migraine headaches as a lateralized throbbing pain associated with numbness and a visual aura, and describes her tension headaches as a throbbing pressure that spreads from the back of her neck over her ears and around her forehead (AR 140; *see also* AR 194.)   Both types of headaches are accompanied by sensitivity to light, sound, and smells. (AR 140.)  When the headaches are bad, it can take her 48 to 72 hours to recover.  (AR 140-41.) She has sought treatment in an emergency room on multiple occasions, but finds "it doesn't really help with the conditions."  (AR 141.)  She notes taking Norco, Maxalt, and Flexeril, but finds medication has "little effect" in reducing her headache pain.  (AR 141.)

**2.     Plaintiff's Disability Reports**

Plaintiff filled out Adult Function Reports on April 27, 2014, and December 15, 2010, describing her concentration and focus issues, tendency to get "sidetracked" and distracted," habitual tardiness, inability to complete tasks, headaches, and sleep issues.  (AR 150-58; 180-96.) Plaintiff has difficulties completing household chores, leaving them "half done" and "taking too long or not completing [them] because [she] moved on to something else[.]"  (AR 152-53; 184.) She enjoys reading "but cannot focus on a book for a long period of time[,]" and watches three hours of television daily but "do[es] not sit through the whole thing."  (AR 154; 187.)  She visits with friends, talks on the phone, and sends emails daily, and goes out shopping, to religious

events, and to visit her mother and friends.  (AR 154; 186-87.)

Plaintiff attributes the termination of her past employment to "chronic absences due to headaches, chronic tardiness due to inattention, interpersonal conflicts due to interpersonal skills, poor performance due to inattention on tasks and failure to complete them in a timely manner." (AR 157; 182-83; 190.)  She "had difficulty just completing this form" and was "sidetracked multiple times and ha[d] to be reminded to come back to it and complete it." (AR 158.)

Plaintiff also describes her "severe" headaches, noting that she "cannot do anything but sleep or lay quietly trying to deal with the pain" when she has a tension or migraine headache. (AR 150).  Her "body shuts itself down, and [she] will sleep for hours, sometimes most of the day." (AR 151.)  When she has a "pain level 10 migraine," Plaintiff goes to the emergency room for treatment.  (AR 192.)  She is unable to deal well with stress, and becomes "overwhelmed and extremely anxious which causes severe migraine headaches and anxiety attacks." (AR 190.)  She has "good days" where she is able to do "easy chores around the house" and "bad days" "where the pain is so bad it's all consuming[.]" (AR 180; 193.)

When she has a headache, Plaintiff reports her ability to lift, bend, stand, walk, and see is also impacted, and her "concentration is even worse than normal." (AR 155; 188-89.)  She experiences blurred vision, nausea, lack of concentration, sensitivity to light, sound, and smell, and severe lateralized pain with her migraines, and "a pain that feels like a vice clamping down around [her] head" with her tension headaches.  (AR 194.)  When she has a migraine she "simply cannot function or be around people, bright lights or loud noises." (AR 156; 194.)  Her migraines typically last two days, but have lasted up to five days, and tend to be followed by a "dull, non-migraine pain type headache" for two to three days.  (AR 194.)  The "frequency and pain of the headaches have increased" over time, so that "not a day goes by that the headaches do not affect [her] life in s[o]me way." (AR 177.)  Plaintiff stated she "very rarely (once or twice a month) ha[s] a day without a headache, though the pain level of each headache is what determines whether [she is] able to function normally in [her] personal/professional life." (AR 194.)  Further,

> . . . both types of headaches have increased in both severity of pain and recurrence over the years (mostly in the last two years.)  As the pain level of each type of headache increases, it becomes more and more difficult to do anything but

attempt to sleep through the pain in a dark/quiet room, though sometimes the pain is so bad, I cannot even sleep.  Though I do have a prescription for pain pills (Norco prescribed by my Doctor which I take when the pain exceeds a level of 6) which help alleviate some to most of the pain (depending on the overall pain level) these do not treat the sensitivity to lights and sound or the nausea and cause enough grogginess to impair my ability to continue functioning normally.  As far as the non-migraine headaches, my Doctor has prescribed Flexeril to take at night in an attempt to alleviate the muscle tension that causes them.  Though[ ] the medication does sometimes help to relax me enough to actually get a good night sleep and they sometimes lower the pain level associated with this headache type, they have not reduced the frequency of them.

. . . I have forced myself through the years to learn to function with mid-level pain (3 to 6 on a scale of 1 to 10 with my average daily pain level being anywhere between 5 and 7 with a "good day" being at level 5 and a "bad day" being at level 7 or higher) it is extremely difficult for me to do so, and completely impossible if the pain level exceeds 6.  I have noticed that in the past two years my pain level has deteriorated and gotten progressively worse . . . .  The progressively worse chronic pain I have lived with the past five years has not only lowered my ability to tolerate the pain (lower pain threshold), but it has also increased my sensitivity to the pain itself.

(AR 194-95.)  It is "extremely difficult if not impossible" for Plaintiff "to do anything other than sleep[ ] in a dark quiet room until the pain passes."  (AR 177; 193-95.)  In her "headache log," out of 583 observed calendar days, Plaintiff reports suffering from a migraine of some severity on 268 days.  (AR 197-202; 223-30.)  Of those days, Plaintiff rated her migraines at a pain level 7 or higher out of 10 on 211 days.  (AR 197-202; 223-30.)  Plaintiff reported a migraine at a 10 out of 10 pain level on February 14, July 4 and December 14, 2010, when she went to the emergency room.  (AR 226; 228; 229.)

Plaintiff also described a "feeling of overall body ache" and feels "weak when it comes to moving around a lot[.]"  (AR 194-95.)  She cannot "bathe or prepare meals or even go up and downstairs without assistan[ce]."  (AR 177.)  In her August 31, 2011, disability report, Plaintiff noted that she was diagnosed with fibromyalgia by Dr. Frank Fine, M.D.  (AR 217-22.)

Finally, Plaintiff described her history of treatment for depression and anxiety, noting

. . . In 2005 I was diagnosed with Major Depressive and Anxiety Disorder, though I have had a couple of "good years" in between (late 2006 to early 2008) they have both gotten worse since then.  I have taken multiple different types of anti-depressants (both SSRIs and SSNRIs) and though they DO make the symptoms more bearable, they do not control the problems associated with the symptoms.

//

11

(AR 195.)  Plaintiff described feelings of worthlessness, irritability, and impaired motivation and self-esteem, a lack of appetite or sex drive, and noted that she has become "withdrawn, insecure, jealous, paranoid, and cannot seem to understand simple communication" from those around her. (AR 194-95.)   She is "constantly tired" with "no energy or motivation to do anything[.]" (AR 195.)

### 3.   Wilson Hatfield's Third-Party Adult Function Report

Plaintiff's fiancé Wilson Hatfield completed a Third-Party Adult Function Report on April 27, 2010, describing Plaintiff's concentration and focus issues, and her tardiness, headaches, and sleep issues.  (AR 142-49.)  He noted that Plaintiff is able to complete some household chores, but lacks the focus and attentiveness to complete chores without reminders.  (AR 144-45.)  She is unable "to sit still or stay on track" and her "ADHD and migraines [a]ffect her ability to concentrate on tasks."  (AR 147.)  Mr. Hatfield also stated that Plaintiff's recurrent "[a]bsences from work get her fired often" and that while she does not handle stress well, she "has learned to cope until headaches occur or she flairs up."  (AR 148.)

### 4.   Moya Palma's Third-Party Adult Function Report

Plaintiff's mother Moya Palma completed a Third-Party Adult Function Report on December 13, 2010, describing Plaintiff's concentration and focus issues, tardiness, gastrointestinal issues, headaches, and sleep issues.  (AR 204-11.)  Ms. Palma noted that when Plaintiff has a "good pain day" she "does what she can to help around the house." (AR 204.)  On a "bad pain day" she "stays in bed in a darkened room" for "2, 3 or 4 days running" due to her migraines.  (AR 204.)  Ms. Palma also notes that Plaintiff "suffers from severe insomnia" and is awakened from sleep by "joint pain."  (AR 205; 209.)  While Plaintiff can handle her own money, Ms. Palma notes that Plaintiff must be supervised because "she can get distracted and makes mistakes."  (AR 207.)

Ms. Palma noted significant limitations, explaining that Plaintiff "can't lift over 20 lbs; can't walk more than ½ block w/out resting; has to step to rest going up or down stairs; has difficult time rising from a squat – sometimes need[s] help; can't sit for more than 10-15 minutes – has to stand up and move around; bending causes pain; kneeling causes same problems as

squatting; can't stand for more than 10-15 minutes – will move or sit down."  (AR 209.)  Finally, Ms. Palma stated that Plaintiff was "fired after 5 years because of differences of opinion with supervisory and management people."  (AR 210.)

**C.      Plaintiff's Testimony at the Administrative Hearing**

During the administrative hearing held on August 17, 2011, Plaintiff argued that while she has exertional limitations due to fibromyalgia and joint pain, "her biggest problem is with depression, ADD and migraines."  (AR 32; 34; 41 ("having a headache is [her] biggest complaint" and her depression and ADD are secondary).)    Plaintiff stated she has "had migraine headaches . . . on and off throughout most of [her] adult life" but recently they had worsened.  (AR 37.)  Plaintiff testified she suffers from a "severe enough migraine headache that [she] can't function normally" three to four days per week, and reported she had a migraine at a pain level four out of ten while testifying.  (AR 36.)  These headaches last three to four days at a time, and are usually followed by a day or two abatement before another headache invariably starts.  (AR 38.)  Plaintiff does household chores one or two days a week, depending on how she feels, but on days when she is "down with a headache, [she's] in a dark room – dark, quiet room, laying down, trying to not move and deal with the pain and throbbing in [her] head."  (AR 41.)

Plaintiff testified that she has been prescribed Cymbalta for neuropathic pain and depression, Norco to manage her pain, and Clonazepam.  (AR 38.)  When asked about her medication "cocktail" Plaintiff noted

> A      I'm taking the one at night – the Clonazepam is a preventative.  It's to lower the amount of [migraines].
>
> Q      A muscle relaxer, doesn't seem to be working, does it?  If you're having migraines that last three or four days, and you're having them with this kind of frequency, right?  I mean, do you tell your doctor that it's not working?
>
> A      Yes.
>
> Q      And so, what happens next?
>
> A      And we've tried a few different things through the year, year-and-a-half I've been seeing him. I mean, we've tried Imitrex.  We've tried a whole bunch of different of the brand names of the Triptin family.  We've tried Topamax, which I can't, actually, afford at this point.  Tried Tegretol and something else that started with a "T".

Q        Do they have other kinds of treatment besides prescription medication that you've tried?

A        For migraines?

Q        Yeah.

A        Not that I'm aware of.

Q        Have you studied up on migraine headaches?

A        Yes, I have.

Q        Read a lot of literature about it?

A        Uh-huh.

Q        You are not aware of any other kinds of treatment?

A        I've heard about acupuncture.  I'm deathly afraid of needles, so that wasn't actually something I'd actually tried.  Somebody suggested that I tried some [a]romatherapy, but part of my [au]ra with the migraine is very sensitive to smells, and it wineds (*sic*) up making me throw-up, so . . . .

(AR 38-39.)  When the ALJ brought up Topamax, which Plaintiff had testified she could not afford, Plaintiff stated "it seems to help like a little bit, but not very much.  It's supposed to lower the frequency of the migraine episodes . . . it like maybe decreases the amount per week by maybe one." (AR 44-45.)  Plaintiff reported that when she tried Topamax, over the course of thirty days the preventative medication didn't make "much of a difference" in her symptoms.   (AR 45.) When the ALJ asked if she was taking any medication for her ADD, Plaintiff responded that she had tried both Ritalin and Adderall, but stopped using them because they "made [her] headaches worse."  (AR 42.)

The ALJ also inquired whether Plaintiff had ever gone to the hospital because of her migraine headaches.  She answered that

> . . . I have; in the past when I had health insurance, I was more prompt to go to the emergency room.  I don't like being a burden on people, and I want to be able to pay my bills, so the last time that I went to the emergency room, I believe, was on the 7 – on the 4th of July of 2010.  There might have been one more in there.  I only go if I just get to the point where I can't handle the pain at all.  I mean, the – like a – ten out of ten situation, which I can get up to a nine out of ten, and sleep through it or lay down and not move for six to eight hours.

(AR 40.)  The ALJ asked whether Plaintiff had checked into her eligibility for insurance, and Plaintiff responded that she been denied MediCal benefits, and had "tried to go through the medically indigent program in [her] county, and was told because [her] mother is making [her] car

14

payments, [she] made too much money[, b]ecause they counted that as income." (AR 45.)

Plaintiff testified she was terminated from her last job "for attendance problems." (AR 35; *see also* AR 43.) She is unable to drive due to the visual aura that accompanies her migraines, so she was "absent because of migraine headache[s] or being late[.]". (AR 35.) She reported telling her employer about her migraines and bringing a note from her doctor "justifying the absences and the tardiness," but was nonetheless terminated. (AR 35.) She was also terminated from her previous job as an insurance sales person "due to migraine headaches being – either being late only able to work a half-a-day instead of a full day or not being able to be there at all, depending on how severe the headache was." (AR 36.)

The ALJ asked about the change in severity of Plaintiff's headaches through her employment history, asking

Q   . . . You've been – if I understand you correctly, you've been having this degree of migraine headaches three to four days a week of migraine headaches for literally for (*sic*) years. And at one point in 2006, you made $24,000.00, right? 24,000.

A   I was terminated from that job because of the headaches.

Q   How many months did you work for them?

A   For that particular company? I worked for them for six years.

Q   Triple "A"?

A   Yeah. The onset of the severe and chronic migraines started in 2003, in the middle of my work for them.

Q   But you worked through – you worked in spite of having the migraines, is that the case? I mean, there's been plenty of days when you had a migraine headache and you worked in spite of them.

A   Yeah. They weren't as bad as they are now.

(AR 46.) The ALJ asked what testing had been done to determine what had caused the worsening of Plaintiff's headaches, and Plaintiff testified that

A   . . . back in 2003, I had a CAT scan, an MRI. They tested my vision, they did allergy testing. They sent me to a nerve specialist, back when I still had insurance is when all this happened.

Q   And these are all coming back negative?

A   Right.

Q   Have they done –

1    A      Inconclusive is what the MRI says, so –

2    Q      Have they done new MRIs and CAT scans more recently?

     A      No, but my doctor would love to do it, but I can't afford to pay for it . . . .

3    Q      So, there's nothing on the horizon that you can look forward to in terms of
4    relief?  Nothing that your doctor is suggesting that might be the cutting edge of
     how to treat –

5    A      No; at this point, he's just treating the symptoms.  He said – we've – my
6    previous doctors have tried to determine the cause and haven't been able to, and I
     can't afford to do anymore of the testing to get behind it, so at this point, he's just
7    treating the symptoms and trying to help me get through as many days as
     possible.

8

9    (AR 47.)

10   **C.      Administrative Proceedings**

11        On October 14, 2011, the ALJ issued a decision and determined Plaintiff was not disabled.

12   (AR  12-23.)    The ALJ found Plaintiff had medically severe impairments including major

13   depressive disorder, without psychotic features; ADHD; anxiety disorder; migraine headaches;

14   cervical spine myositis; right shoulder tendinitis with impingement; and panic attacks with fear

15   and hypervigilance.  (AR 14.)  The ALJ determined these impairments did not meet or equal a

16   listed impairment.  (AR 15-16.)  The ALJ found Plaintiff retained the RFC "to perform a wide

17   range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  Specifically, [she] can

18   sit 6 hours in an 8-hour day; she can stand and or walk 2 hours in an 8-hour day; she can do no

19   more than frequent reaching overhead with her right upper extremity; and she can have no more

20   than frequent interaction with the general public."  (AR 15-16.)

21        Given this RFC, the ALJ found Plaintiff was able to perform her past relevant work as a

22   quality assurance clerk, and such work does not require the performance of work-related activities

23   precluded by her RFC.  (AR 21-22.)  The ALJ further determined, in the alternative, considering

24   her age, education, work experience, and RFC, there are other jobs that exist in significant

25   numbers in the national economy that Plaintiff can also perform.   (AR 22-23.)   The ALJ

26   concluded Plaintiff was not disabled, as defined in the Social Security Act, from July 4, 2010, the

27   alleged onset date, to the date of the decision.  (AR 23.)

28   //

**D.      Plaintiff's Complaint**

On August 18, 2013, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff argues the ALJ failed to articulate clear and convincing reasons for finding her statements less than fully credible, and failed to adequately consider her migraine headaches and associated limitations and symptoms in his RFC assessment.  (Doc. 14.)

### III.      SCOPE OF REVIEW

The Commissioner's decision that a claimant is not disabled will be upheld by a district court if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied.  42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Davis v. Heckler*, 868 F.2d 323, 325 (9th Cir. 1989); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999); *Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985) (the findings of the Commissioner as to *any* fact, if supported by substantial evidence, are conclusive.) Substantial evidence is more than a mere scintilla, but less than a preponderance.  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice."  *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted); *see also Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (the Court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion.") The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

1    The role of the Court is *not* to substitute its discretion in the place of the ALJ – "[t]he ALJ

2  is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

3  ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted);

4  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  "Where the evidence is susceptible to more

5  than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion

6  must be upheld."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002); *Andrews v. Shalala*, 53

7  F.3d 1035, 1041 (9th Cir. 1995); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (the

8  court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ

9  on a ground upon which he did not rely.");  *Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir.

10  1987) (if substantial evidence supports the administrative findings, or if there is conflicting

11  evidence supporting a particular finding, the finding of the Commissioner is conclusive).  The

12  court will not reverse the Commissioner's decision if it is based on harmless error, which exists

13  only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate

14  nondisability determination.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)

15  (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006)); *see also Burch v. Barnhart*, 400

16  F.3d 676, 679 (9th Cir. 2005).

17                          **IV.    APPLICABLE LAW**

18    An individual is considered disabled for purposes of disability benefits if he is unable to

19  engage in any substantial, gainful activity by reason of any medically determinable physical or

20  mental impairment that can be expected to result in death or that has lasted, or can be expected to

21  last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

22  1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

23  impairments must result from anatomical, physiological, or psychological abnormalities that are

24  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

25  such severity that the claimant is not only unable to do his previous work, but cannot, considering

26  his age, education, and work experience, engage in any other kind of substantial, gainful work that

27  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

28  //

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.  In Step 1, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, the ALJ moves to Step 3 and determines whether the claimant has a severe impairment or combination of impairments that meet or equal the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is therefore presumptively disabled.  *Id.* §§ 404.1520(d), 416.920(d).  If not, at Step 4 the ALJ must determine whether the claimant has sufficient RFC despite the impairment or various limitations to perform her past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, at Step 5, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

### A.   The ALJ Erred in Assessing Plaintiff's Credibility

Plaintiff argues that the ALJ erred by finding Plaintiff's statements about her migraine pains and limitations in her activities of daily living to be less than fully credible, and by failing to address her migraine headaches in his RFC assessment.

#### 1.   The Parties' Contentions

Plaintiff contends the ALJ failed to articulate clear and convincing reasons for discounting her statements regarding the severity and extent of her limitations and symptoms of migraine headaches.  (Doc. 11, 18.)  Plaintiff contends the ALJ improperly discounted her testimony on the grounds that she "has not generally received the type of medical treatment one would expect for a totally disabled individual" (Doc. 14, 9-10; *see* AR 19), and her "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty."   (Doc. 14, 8-9; *see* AR 19.)  The Commissioner contends the ALJ reasonably found "the alleged severity of Plaintiff's

1   reported symptoms were disproportionate to the level of treatment she received, as well as the

2   limited medical evidence." (Doc. 15, 7.)

3       **2.    Legal Standard**

4       In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

5   must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell*

6   *v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc). First, the ALJ must determine whether

7   the claimant has presented objective medical evidence of an underlying impairment that could

8   reasonably be expected to produce the pain or other symptoms alleged. *Vasquez*, 572 F.3d at 591.

9   The claimant is not required to show that her impairment "could reasonably be expected to cause

10  the severity of the symptom [she] has alleged; she need only show that it could reasonably have

11  caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).

12      If the claimant meets the first test and there is no evidence of malingering, the ALJ can

13  only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear

14  and convincing reasons" for the rejection. *Id.* An ALJ is not "required to believe every allegation

15  of disabling pain" or other non-exertional impairment. *Orn*, 495 F.3d at 630. However, to

16  discredit a claimant's testimony when a medical impairment has been established, the ALJ must

17  provide "specific, cogent reasons for the disbelief." *Id.* (quoting *Morgan*, 169 F.3d at 599).

18  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and

19  what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d 715, 722 (9th

20  Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). The ALJ's findings must

21  be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

22  [Plaintiff's] testimony." *Thomas*, 278 F.3d at 958.

23      The ALJ also may consider: (1) the claimant's reputation for truthfulness, prior

24  inconsistent statements, or other inconsistent testimony, (2) unexplained or inadequately explained

25  failure to seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily

26  activities. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Bray v. Comm'r of*

27  *Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284

28  (9th Cir. 1996); 20 C.F.R. §§ 404.1529, 416.929. Other factors the ALJ may consider include a

claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

An ALJ's credibility finding must be properly supported by the record and sufficiently specific to assure a reviewing court that the ALJ did not arbitrarily reject a claimant's subjective testimony.  *Bunnell*, 947 F.2d at 345-46.  The ALJ's decision must contain specific reasons for the finding on credibility, supported by the evidence in the record, sufficiently specific to make clear the weight the adjudicator gave to the individual's statements and the reasons for that weight.  Social Security Ruling 96-7P. [2]  "If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing."  *Tommasetti*, 533 F.3d at 1039.

Neither party contests the ALJ properly determined that the symptoms claimed by Plaintiff could reasonably be caused by Plaintiff's severe mental impairments of major depressive disorder, ADHD, anxiety disorder, migraine headaches, and panic attacks with fear and hypervigilance.  (*See* AR 14; 19.)  Further, neither party alleges Plaintiff is malingering.  As a result, the ALJ was required to provide clear and convincing reasons for rejecting Plaintiff's subjective testimony regarding her symptoms.  *See Lingenfelter*, 504 F.3d at 1036.

### 3.  Analysis

#### a.  The ALJ Failed to Articulate Clear and Convincing Reasons for Discounting Plaintiff's Pain and Symptom Testimony

Plaintiff contends that the ALJ improperly discounted her testimony on the grounds that she "has not generally received the type of medical treatment one would expect for a totally disabled individual."  (Doc. 14, 9-10; *see* AR 19.)  The ALJ found "[t]here is little medical evidence that [Plaintiff] has undergone MRIs (*sic*) or x-rays; been referred to or seen by any specialists; or been recommended for surgery or other treatment options."  (AR 19.)  The Commissioner argues that Plaintiff's "treatment notes do not record any clinical signs or objective

---

[2]    Social Security Rulings are final opinions and statements of policy by the Commissioner of Social Security, binding on all components of the Social Security Administration. 20 C.F.R. § 422.406(b)(1). They are "to be relied upon as precedent in determining cases where the facts are basically the same."  *Paulson v. Bowen*, 836 F.2d 1249, 1252 n.2 (9th Cir. 1988).

1  testing substantiating the existence of disabling migraines" (Doc. 15, 6), and notes that neither of

2  Plaintiff's treating physicians "referred Plaintiff to a pain management program, nor did they take

3  aggressive steps to identify and resolve the cause of Plaintiff's migraine symptoms." (Doc. 15, 6.)

4  Plaintiff contends the ALJ mischaracterized her treatment history as "routine or conservative in

5  nature," arguing her medical record "reveals a longitudinal history of medical treatment where the

6  doctors keep trying to find the best prescription combinations to treat her pain and headaches."

7  (Doc. 14, 9-10.)

8      The Commissioner is correct that the ALJ could permissibly consider the nature of

9  Plaintiff's treatment in his assessment of Plaintiff's credibility. *See Parra v. Astrue*, 481 F.3d 742,

10  750-51 (9th Cir. 2007) (evidence of conservative treatment is sufficient to discount a claimant's

11  testimony regarding severity of an impairment); *see also Tommasetti*, 533 F.3d at 1039 (ALJ's

12  finding that plaintiff's favorable response to conservative treatment including physical therapy and

13  the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a

14  lumbosacral corset undermined plaintiff's reports regarding the disabling nature of his pain was

15  permissible); and *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (rejecting subjective pain

16  complaints where petitioner's "claim that she experienced pain approaching the highest level

17  imaginable was inconsistent with the 'minimal, conservative treatment' that she received").

18  However, the ALJ's finding that Plaintiff's care was too conservative for a disabling condition is

19  not supported by substantial evidence.

20      The ALJ found Plaintiff "has received limited counseling, has never treated with a

21  psychiatrist or psychologist, and had, at times, cancelled or failed to show up for therapy

22  appointments[,]" and that "[t]here is little medical evidence that [she] has undergone MRI's or x-

23  rays; been referred to or seen by any specialists; or been recommended for surgery or other

24  treatment options."   (AR 18-19.)   In making his finding that Plaintiff "has not generally received

25  the type of medical treatment one would expect for a totally disabled individual[,]" the ALJ

26  provides no details or explanation as to how the conservative treatment Plaintiff received for her

27  mental impairments – in particular, her migraine headaches – supports the finding that Plaintiff

28  was not credible, and the ALJ offers no suggestion as to what other type of treatment Plaintiff

1    should have sought.  (AR 18-19.)

2         The medical records, in fact, indicate Plaintiff had complained of severe symptoms and

3    pain for years (AR 245; 261-62), undergone intensive testing while she had insurance to cover it

4    (AR 245), been admitted to the Emergency Room for episodes of intense pain due to her

5    impairments (AR 141; 192; 226; 228-29; 245-46), and tried a variety of medications since she

6    began seeking medical attention for her migraine and tension headaches.  (AR 245-46; 248-62;

7    305-06; 320-22.)   As early as March 2007, Plaintiff complained to her treating doctor about

8    lateralized "temporal throbbing" headaches, and reported seeing a psychologist for her depression

9    and neuroses.  (AR 261-62.)   In 2008, Plaintiff described her headaches as "throbbing and

10   pounding," lasting up to three days, radiating from the base of her skull through the bi-temporal

11   areas, and accompanied by photosensitivity to light and nausea.  (AR 245.)  By 2008, Plaintiff had

12   already tried multiple "triptans" medications, none of which had proven "very effective" to

13   prevent and treat her pain; she repeatedly went to the emergency room to get a "Demerol

14   injection" when the pain was too severe.  (AR 245-46.)

15        Contrary to the ALJ's conclusion that Plaintiff "has no other history of treatment or

16   hospitalization" supporting her allegations of disabling psychiatric impairments and "has never

17   treated with a psychiatrist or psychologist (AR 18), Plaintiff sought counseling treatment for her

18   psychiatric impairments over the course of five years with a psychologist, Dr. Tamara Elkins, MD,

19   from 2005 to 2010.  (*See* AR 264; 327-32.)  The ALJ minimizes this lengthy treatment history

20   because "there is little evidence of record that Dr. Elkins treated the claimant after the amended

21   onset date of July 4, 2010."  (AR 21; *see generally* AR 19-21.)  However, Plaintiff also sought

22   counseling in the spring of 2011 with the Center for Human Services, where she was counseled by

23   Marriage and Family Trainee Rebecca Fry over the course of five months.  (AR 337-61.)  Though

24   the ALJ noted that Plaintiff failed to appear for several of her sessions with Ms. Fry, "citing

25   migraines or illness," and reported that on one occasion she "had a migraine because she is unable

26   to afford migraine medication," the ALJ did not discuss what weight, if any, he accorded to Ms.

27   Fry's opinions.  (AR 18-19.)

28   //

23

1    The Commissioner argues that it was reasonable for the ALJ to find a "three-year gap in

2  Plaintiff's mental health treatment undermined her alleged level of mental dysfunction." (Doc. 15,

3  8.)  However, the ALJ identified no such glaring gap in Plaintiff's treatment records (*see* AR 18-

4  21), and even if the ALJ based his decision on such a rationale, this Court may not affirm the

5  ALJ's decision based on the Commissioner's post-hoc rationale.  *Orn*, 495 F.3d at 630.  The only

6  reason the ALJ identified for rejecting Plaintiff's testimony regarding her condition was that she

7  "has not generally received the type of medical treatment one would expect for these

8  conditions . . . for a totally disabled individual." (AR 18-19.)  The ALJ's decision rests entirely on

9  his opinion that Plaintiff failed to pursue sufficiently aggressive, cutting-edge treatment for her

10  medically determinable psychiatric impairments.  (AR 18, 19; *see* AR 47.)

11    The Commissioner also argues that an unexplained failure to seek treatment can cast doubt

12  on the sincerity of Plaintiff's pain testimony.  (Doc. 15, 8 (citing *Fair v. Bowen*, 885 F.2d 597, 603

13  (9th Cir. 1989).)  However, Plaintiff's failure to receive medical treatment during the period when

14  she had no medical insurance *cannot* support an adverse credibility finding.  While the Ninth

15  Circuit has held that an "unexplained, or inadequately explained, failure to seek treatment" may be

16  the basis for an adverse credibility finding, "[d]isability benefits may not be denied because of the

17  claimant's failure to obtain treatment he cannot obtain for lack of funds." *Gamble v. Chater*,

18  68 F.3d 319, 321 (9th Cir. 1995); *see also* Social Security Ruling ("SSR") 82-59 (a person who

19  otherwise meets the disability criteria may not be denied benefits for failing to obtain treatment

20  that he cannot afford); SSR 96-7p.  Plaintiff testified that any gaps in her medical care are only

21  there because she "can't afford to pay for it." (AR 47.)  Plaintiff testified that

22    A    . . . back in 2003, I had a CAT scan, an MRI.  They tested my vision, they
23    did allergy testing.  They sent me to a nerve specialist, back when I still had
     insurance is when all this happened.

24    Q    . . . Have they done new MRIs and CAT scans more recently?

25    A    No, but my doctor would love to do it, but I can't afford to pay for it . . . .

26  (AR 47.)  The ALJ pursued his line of questioning, pressing Plaintiff to admit that some treatment

27  exists that she had not yet tried that would offer her relief from her migraine symptoms.  (AR 47.)

28  Plaintiff testified that she is working with her treating physicians to treat her pain symptoms as

best she can, but is unable to "afford to do anymore of the testing" to determine the ultimate cause of her symptoms:

> Q      So, there's nothing on the horizon that you can look forward to in terms of relief?  Nothing that your doctor is suggesting that might be the cutting edge of how to treat –
>
> A      No; at this point, he's just treating the symptoms.  He said – we've – my previous doctors have tried to determine the cause and haven't been able to, and I can't afford to do anymore of the testing to get behind it, so at this point, he's just treating the symptoms and trying to help me get through as many days as possible.

(AR 47.)   When asked for specific medications, Plaintiff testified that she had tried "a whole bunch of different of the brand names (*sic*) of the Triptin family" including "Topomax, which [she] can't, actually, afford at this point."   (AR 38; *see also* AR 18 (noting Plaintiff told Ms. Fry she was unable to afford migraine medication).)

In the Ninth Circuit "[t]he relevant question is not whether somewhere on the planet there exists a [treatment] that the claimant could use, if only [s]he could afford the enormous price; rather, the question is whether the claimant, [her]self, can realistically obtain such a [treatment]." *Gamble*, 68 F.3d at 322; *see, e.g., Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("the medicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered.").   Despite lengthy questioning on the nature of Plaintiff's years of treatment for severe migraines and her inability to afford further treatment during the hearing, the ALJ never discussed Plaintiff's proffered reason for not pursuing more aggressive treatment during his decision or as part of his credibility finding.   (*See* AR 18-21.)   In fact, the ALJ did not substantively address Plaintiff's lack of insurance or alleged inability to afford treatment in his decision *at all*.   (*See* AR 18-21; *see also* AR 18 (noting in the summary of medical evidence that Plaintiff had told Ms. Fry "she is unable to afford migraine medication.").)   Plaintiff's failure to pursue more aggressive treatment is not a sufficiently clear and convincing reason to support the ALJ's adverse credibility finding, where the ALJ ignored a significant portion of the record indicating that she cannot afford such treatment, additional diagnostic testing, or referral to specialists while not covered by insurance.

Though the Commissioner acknowledges that Plaintiff "initially discontinued mental health treatment due to lack of insurance coverage," the Commissioner contends that Plaintiff "nevertheless demonstrated sufficient resources to reestablish counseling in 2011, raising an inference that she was not without mental health treatment options during the interim period." (Doc. 15, 8.)   Regardless of whether this is so, the Commissioner again provides a post-hoc rationale not articulated by the ALJ himself.   *Orn*, 495 F.3d at 630.  The only reason the ALJ identified, and the only reason the Court may review, for rejecting Plaintiff's testimony on her condition was that she "has not generally received the type of medical treatment one would expect for these conditions . . . for a totally disabled individual."  (AR 18-19).  The ALJ's decision rests on his belief that Plaintiff failed to pursue sufficiently aggressive treatment for her psychiatric impairments.  (AR 18, 19; *see* AR 47.)  The ALJ never discussed Plaintiff's proffered – and permissible – explanation that she pursued the most aggressive treatment she could afford.  (AR 38-40, 44-45, 46-47.)  *See Orn*, 495 F.3d at 638 (a plaintiff's failure to receive medical treatment during the period that she had no medical insurance *cannot* support an adverse credibility finding).

An ALJ may permissibly find a claimant's statements "less credible if the level or frequency of treatment is inconsistent with the level of complaints" – the ALJ may not, however, "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment" including whether the claimant is unable to pay, whether "[t]he individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely," and whether medication may relieve symptoms.  SSR 96-7p.  The ALJ engaged in no such inquiry in this case.

*Flaten v. Sec'y of Health & Hum. Servs*., 44 F.3d 1453 (9th Cir.1995), is instructive.  In *Flaten*, the court upheld an adverse credibility determination for failure to seek treatment despite the plaintiff's alleged inability to pay, because during the time Flaten alleged she was unable to afford treatment she had received other medical care and had failed to mention her allegedly disabling back pain.  *Id*. at 1464.  By contrast, the medical record before the Court is sufficiently

1  replete with Plaintiff's ongoing complaints of migraine headaches to her treating and consultative

2  physicians prior to her alleged onset date and to the therapist trainee after her alleged onset date;

3  further unlike *Flaten*, Plaintiff *sought treatment* for her migraine symptoms whenever she was

4  able to go to the doctor.  Also unlike *Flaten*, the ALJ did not articulate Plaintiff's failure to report

5  her migraine symptoms to any medical source as a reason for discounting her credibility – the ALJ

6  discounted her testimony based on her receipt of "treatment that is routine or conservative in

7  nature." (AR 19.)

8        Nowhere in his opinion does the ALJ suggest that Plaintiff failed to follow the prescribed

9  course of treatment from her various doctors, and nowhere in the records do those doctors suggest

10  that there are more aggressive forms of treatment available to or appropriate for Plaintiff to relieve

11  her migraine symptoms.  There is no conflicting evidence in the medical record, after years of

12  treatment, to indicate Plaintiff did not in fact suffer from severe migraine and tension headaches.

13  (*See also* AR 14-15, finding Plaintiff's "migraine headaches" a severe impairment at Step 2.)

14  Throughout the course of her treatment, Plaintiff has been prescribed and has taken Imitrex,

15  Topomax, Tegretol, and other members of the "Triptin" family for her migraines, as well as Norco

16  for pain and Clonazepam as preventative medication.  (*See* AR 36, 47.)  The ALJ does not state or

17  suggest how her severe migraines should have been treated, and how that hypothetically sufficient

18  treatment differs from the treatment that Plaintiff actually received.  Plaintiff's failure to pursue

19  more aggressive treatment that she cannot afford, or seek additional diagnostic testing or referral

20  to specialists while not covered by insurance, is not a sufficiently clear and convincing reason to

21  support the ALJ's adverse credibility finding.

22  |  **b.**    **The ALJ Improperly Discounted Plaintiff's Testimony on the Impact of
23  |            Her Headaches on Her Activities of Daily Living**

24        Plaintiff further contends that the ALJ improperly discounted her "allegedly limited daily

25  activities." (Doc. 14, 8-9; *see* AR 19.)  The ALJ found that although Plaintiff

26  |  . . . has described daily activities which are fairly limited, two factors weigh
   |  against considering these allegations to be strong evidence in favor of finding the
27  |  claimant disabled.  First, allegedly limited daily activities cannot be objectively
   |  verified with any reasonable degree of certainty.  Secondly, even if [Plaintiff's]
28  |  daily activities are truly as limited as alleged, it is difficult to attribute that degree

of limitation to [her] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence.

(AR 19.)  Defendant did not address this argument in her opposition.  (*See* Doc. 15.)

//

Plaintiff testified before the ALJ that on a normal day she has breakfast and does light chores around the house.  (AR 40.)  One or two days a week, she will "clean off the table," sweep, dust, and help fold laundry.  (AR 41.)  The other days when she is "down with a headache," she stays "in a dark room – dark, quiet room, laying down, trying not to move and deal with the pain and throbbing in her head."  (AR 41.)  She leaves the house "[t]wo or three times a week" and only drives three blocks to the grocery store and back home.  (AR 41.)  Plaintiff unequivocally testified that "having a headache" was her "biggest complaint" (AR 41.)  However, the ALJ only briefly discussed her "moderate restriction in activities of daily living" by noting that in her Third Party Function Report, Plaintiff reported that on "bad days[ ] she must stay in bed in a darkened room due to headache pain" (AR 15), and in her Third Party Function Report, Plaintiff's mother reported that "on a good day the claimant might help around the house or go grocery shopping but on a bad day, when having a migraine, she will stay in bed in a darkened room and the migraines will sometimes lasts (*sic*) 2 to 4 days straight.  (AR 19.)  At no other point in the opinion does the ALJ discuss Plaintiff's activities of daily living, aside from concluding that Plaintiff's "fairly limited" daily activities cannot be objectively verified or attributed to her medical condition with "any reasonable degree of certainty."  (*See* AR 19.)

The first reason given by the ALJ "weigh[ing] against considering these allegations to be strong evidence in favor of finding the claimant disabled" was that Plaintiff's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty."  (AR 19.)  This is a statement of general fact that bears only a small amount of relevance to Plaintiff's credibility in this specific case: "simply because a fact cannot be verified objectively provides little evidence to support the conclusion that the individual is not being truthful about such fact in any particular instance."  *Garcia v. Astrue*, 2013 U.S. Dist. LEXIS 61039, *49 (S.D. Cal. Mar. 13, 2013) (internal quotation omitted).  The fact that this exact wording has been repeatedly used by other ALJs as support for the failure to credit the testimony of plaintiffs in other social security

cases, suggests that "the language used to reach a factual determination in these instances is based more on an archived form than on the particular claimant who was before the ALJ." *McKim v. Astrue*, 2012 U.S. Dist. LEXIS 152948, *11 (W.D. Wash. Sept. 4, 2012).

The second reason given by the ALJ was that "it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." (AR 19.) The ALJ fails to specify "other reasons" to which the degree of limitation plaintiff alleges she suffers can be attributed, and provides only a vague and unspecific conclusion that "other factors discussed in this decision" undermine Plaintiff's credibility. This is not a specific and cogent reason sufficient to support an adverse credibility finding. *Lester*, 81 F.3d at 834. The ALJ cannot rely on general findings, but "'must specifically identify what testimony is credible and what evidence undermines the claimant's complaints.'" *See Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (quoting *Morgan*, 169 F.3d at 599 (9th Cir. 1999)).

Although the ALJ offered his conclusion that Plaintiff's complaints were "not credible," he did not provide any specific or cogent reasons for his conclusion other than the "relatively weak medical evidence." In particular, no reasons were given for rejecting Plaintiff's testimony as to her "fairly limited" activities of daily living. The ALJ's general statement that Plaintiff's testimony was unbelievable is insufficient to support the rejection of her complaints. *Lester*, 81 F.3d at 834.

### c. Plaintiff was Prejudiced by the ALJ's Discounting of Her Migraine Testimony

Plaintiff argues that the ALJ's failure to incorporate any limitations caused by the symptoms of her migraine headaches into his RFC assessment was prejudicial error. (Doc. 14, 7.) The ALJ determined that Plaintiff's mental impairment of severe migraine headache was a medically severe impairment at Step 2, but discounted *all* her testimony regarding her pain, symptoms, or limitations in activities of daily living before reaching his RFC assessment. (*See* AR 16; 19.) Because the ALJ had already comprehensively dismissed Plaintiff's testimony on her medically determinable headaches, he did not incorporate her alleged limitations into his RFC analysis. Had the ALJ properly considered Plaintiff's testimony on her pain and symptoms and

1   the limiting effects of her migraine headaches, including her testimony that for three to four days a

2   week she is unable to do anything except lay in a darkened room, the ALJ may have found

3   Plaintiff incapable of performing past relevant work on a full-time basis.

4         The failure to include Plaintiff's migraine testimony in the RFC assessment was prejudicial

5   error.  As such, Plaintiff has shown a "substantial likelihood of prejudice" requiring remand to the

6   agency for further administrative proceedings.  *See, e.g., Schneider v. Comm'r Soc. Sec. Admin.*,

7   433 F. App'x 507, 509 (9th Cir. 2011).  Remand is appropriate for renewed consideration of the

8   Plaintiff's credibility, and the impact of Plaintiff's migraine headaches on her residual functional

9   capacity.

10  **C.     Remand is Required**

11        "The court shall have power to enter, upon the pleadings and transcript of the record, a

12  judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

13  with or without remanding the cause for a hearing."  42 U.S.C. § 405(g).  In Social Security cases,

14  the decision to remand to the Commissioner for further proceedings or simply to award benefits is

15  within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If

16  additional proceedings can remedy defects in the original administrative proceedings, a social

17  security case should be remanded.  Where, however, a rehearing would simply delay receipt of

18  benefits, reversal [and an award of benefits] is appropriate."  *Id.* (alteration in original) (internal

19  quotation marks omitted); *see also Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396,

20  1399 (9th Cir. 1988) ("Generally, we direct the award of benefits in cases where no useful purpose

21  would be served by further administrative proceedings, or where the record has been thoroughly

22  developed." (citation omitted)).  Here, the remand is appropriate for renewed consideration of

23  Plaintiff's credibility and for clarification of the impact, if any, of Plaintiff's severe migraine

24  headaches on her RFC.

25                              **CONCLUSION**

26        Based on the foregoing, the Court finds that the ALJ's decision is not supported by

27  substantial evidence and is, therefore, REVERSED, and the case REMANDED to the ALJ for

28  further proceedings consistent with this order. The Clerk of this Court is DIRECTED to enter

judgment in favor of Plaintiff Reigna Elise Fisher and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **February 19, 2015**                            **/s/ Sheila K. Oberto**
                                                             UNITED STATES MAGISTRATE JUDGE